MHN

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| THOMAS HOLSTEIN, d.b.a. as "LAWLINE", an unincorporated association of lawyers, paralegals and laymen registered on August 3, 1979 as Illinois trademark 47960, and d.b.a. as LawyerNetwork.com, an unincorporated association of lawyers, paralegals laymen and non-lawyers. )))))))))) | 09CV6239<br>JUDEG LEFKOW<br>MAG. JUDGE DENLOW |
| v. )) | **JURY TRIAL DEMANDED** |
| THE AMERICAN BAR ASSOCIATION, THE HONORABLE THOMAS R. FITZGERALD, THE HONORABLE CHARLES E. FREEMAN, THE HONORABLE ROBERT R. THOMAS, THE HONORABLE THOMAS L. KILBRIDE, THE HONORABLE RITA B. GARMAN, THE HONORABLE LLOYD A. KARMEIER, THE HONORABLE ANNE M. BURKE, in their judicial capacity as justices of and constituting the SUPREME COURT OF ILLINOIS, THE HONORABLE EUGENE R. WEDOFF, THE HONORABLE A. BENJAMIN GOLDGAR, THE HONORABLE JACK B. SCHMETTERER, THE HONORABLE JOHN D. SCHWARTZ, THE HONORABLE JACQUELINE P. COX, THE HONORABLE MANUEL BARBOSA, THE HONORABLE CAROL A. DOYLE, THE HONORABLE BRUCE W. BLACK, THE HONORABLE PAMELA S. HOLLIS, THE HONORABLE SUSAN PIERSON SONDERBY, THE HONORABLE JOHN H. SQUIRES, in their judicial capacity as Bankruptcy judges and constituting the Bankruptcy Court of the Northern District Court, Eastern Division, WILLIAM T. NEARY, INDIVIDUALLY and as UNITED )))))))))))))))))))))))))))))))))))) | |

**FILED**

JN Oct 6, 2009

OCT A B 2009

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

1

| | |
|---|---|
| STATES TRUSTEE FOR THE NORTHERN DISTRICT OF ILLINOIS (Region 11), IRA BODENSTEIN, in his official capacity as former UNITED STATES TRUSTEE FOR THE NORTHERN DISTRICT OF ILLINOIS (Region 11), SANDRA RASNAK , in her official capacity as a supervisor and ASSISANT UNITED STATES TRUSTEE, CONSTANTINE HARVALIS in his official capacity as a supervisor and ASSISANT UNITED STATES TRUSTEE, ROBERT B. KATZ, as a member of the Chapter 7 PANEL OF TRUSTEES, MERIEL COLEMAN, INDIVIDUALLY, FREDERICK C. DAY, INDIVIDUALLY, and J. P. MORGAN CHASE BANK, N.A. (formerly BANK ONE and FIRST CHICAGO/FIRST NATIONAL BANK OF CHICAGO) | |

## COMPLAINT

THOMAS HOLSTEIN, d.b.a. as "LAWLINE", an unincorporated association of lawyers,

paralegals and laymen registered on August 3, 1979 as Illinois trademark 47960 (Exhibit

1), and d.b.a. as LawyerNetwork.com, an unincorporated association of lawyers,

paralegals laymen and non-lawyers, brings this action against the defendants in COUNT I

for damages and injunctive relief for violation of the Sherman Antitrust Act 15 U.S.C.

Section 1 and 2, and in Count II for injunctive relief and damages for violation of the

Civil Rights Act of 1871, as amended, 42 U.S.C. Sections 2201-2202, and for declaratory

judgment under the Declaratory Judgment Act, 28 U.S.C. Section 2201-2202, and alleges

as follows:



For the conveience of the Court and the parties, an index to this complaint is attached hereto as the last page of this complaint and made a part hereof as Appendix "A". **Copies of this Complaint, links to other relevant documents, <u>Exhibits</u> to this Complaint, and online informational videos** will be posted at <u>lawyernetwork.com</u>, **and** <u>lawline.org</u>

<div align="center">

**COUNT I**

**<u>COMBINATION AND CONSPIRACY IN RESTRAINT OF TRADE</u>**

**For Prior litigation between the parties in LAWLINE v. American Bar Association, 956 F.2d 1378 (7th Cir. 1992, cert denied 510 U.S. 992 (1993), go to para 24, or**

**<u>click here</u>**

</div>

<u>Introduction:</u> For generations Canon 8 of the ABA Rules of Professional Responsibility and of the Illinois Rules of Professional Responsibility have provided that "A lawyer should assist in improving the Legal System".

> "Rules of law are deficient if they are not just, understandable, and responsive to the needs of society. If a lawyer believes that the existence or absence of a rule of law, substantive, or procedural, causes or contributes to an unjust result, he should endeavor by lawful means to obtain appropriate changes in the law. He should encourage the simplification of laws and the repeal or amendment of laws that are outmoded. Likewise, legal procedures should be improved whenever experience indicates a change is needed."

This Complaint is brought in furtherance of the above provision.

1. In April 2005 President George W. Bush signed the new bankruptcy law (BAPCP). On July 1, 2005 the Mandatory Electronic Filing Rule of the Bankruptcy Court for of the Northern District of Illinois, which is challenged herein, went into effect.

2. This "two step" Republican dance was a coordinated effort to cut back the rights of consumers under the prior bankruptcy law, that had been sponsored by the Carter Adminstration during the economic crisis of the 1970's.

3.  The New Bankrupt Law and the Mandatory Electronic Filing Rule of the Bankruptcy Court for the Northern District of Illinois were flip sides of the same coin.

4.  The New Bankrupt Law, which had been sponsored by the Bush Administration, banks and creditors, severely limited the rights of consumers to file for bankruptcy, and the Mandatory Electronic Filing Rule of the Bankruptcy Court for the Northern District of Illinois reduced competition among licensed lawyers, increased legal fees, and impeded consumer access to the bankruptcy courts.

5.  The Mandatory Electronic Filing Rule of the Bankruptcy Court for the Northern District of Illinois wrongfully applies the overly broad and restrictive provisions of ABA Rule 5.4 and Illinois Rule 5.4 to injure consumers by limiting competition among lawyers, keeping legal fees high in the bankruptcy court, impeding consumer access to the bankruptcy court, and preventing the development of innovative legal delivery system in the public interest.

6.  In particular, **the Mandatory Electronic Filing Rule** of the Bankruptcy Court for the Northern District of Illinois currently and wrongfully **impedes consumers trying to save their homes from foreclosure under Chapter 13.**

<u>**Filing v Representation**</u>

7.  **Filing a bankruptcy case is an entirely  clerical act which does not require the conceptual analysis and skills of a licensed lawyer**.

8.  However, under the overly broad Bankruptcy Court Mandatory Electronic Filing Rule **only entirely "lawyer only" businesses are allowed to register for electronic filing**.

4

9.  The underlying public policy of the Antitrust Act favors competition, and is founded upon the principle that increased competition stimulates lower prices in the public interest. The Shermen Act also prohibits tying arrangements in which the sale of a service is conditioned upon the sale of another service, such as the tying of clerical filing with the lawyer only client representation, similar to the **mandatory electronic filing rule** as adopted by the Bankruptcy Court of the Northern District of Illinois.

10.  **The mandatory electronic filing rule** as adopted by the Bankruptcy Court of the Northern District of Illinois has the opposite effect, and **codifies into Federal law the overly broad and overly restrictive ABA and State of Illinois Rule 5.4.**

11.  **The ABA rule**, which prohibits lawyers from practicing law in any form of conventional business organization in which a non-lawyer owns stock or has an ownership interest of any kind, **has remained unchanged for over 40 years, and still keeps legal fees artificially high by restricting competition.**

12.  **It pre-dates allowing lawyers to advertise, does not reflect the evolution of our society and does not meet the public interest needs of consumers today.**

13.  **It is also embodied in the "lawyer only business organization structure" that is required to register for mandatory electronic filing in the Bankruptcy Court** of the Northern District of Illinois, Eastern Division, which is challenged herein, as it keeps the legal fees artificially high for consumers in financial need who are trying to save their homes from foreclosure through Chapter 13 reorganization.

14.  **The mandatory electronic filing rule is overbroad and does not distinguish between the business entity that is doing the mechanical filing of a**

bankruptcy case, and the licensed lawyer that is actually representing the debtor and appearing before the court.

15. **A less restrictive rule**, such as one in accord with the original ABA modification that was recommended by the Official ABA Rules Committee for approval to ABA House of Delegates (HOD) in 1983, **can adequately safeguard and protect the general public without restricting competition in a manner that overly protects the economic interest of licensed lawyers** who are practicing under a traditional law firm structure in which only licensed lawyers may own stock or or have any other ownership interest . **(See, Recommended Rule 5.4, Exhibit 2 and HOD transcript rejecting the recommended rule, 3,** click here).

<p style="text-align:center"><strong><u>Rule History</u></strong></p>

16. **In 1976 the U.S. Justice Department filed <u>two</u> antitrust actions against the American Bar Association (ABA)** because Cannon 2 and Rule DR-103 of the ABA Code of Professional Responsibility prohibited licensed lawyers from practicing law under any type of conventional business structure, such as corporations, partnerships or public service organizations, if a non-lawyer owns stock or has an ownership interest of any kind. **(See, United States v. American Bar Ass'n, No 76-1182 (D.D.C., filed June 25, 1976, and United States v. American Bar Ass'n, No 76 C 3475 (N.D. Ill. 1976).**

17. The U.S. Justice Department, in conjunction with the Federal Trade Commission, further alleged that the ABA used this business structure restriction to kept legal fees artificially high and improperly limited consumer access to legal information. In a subsequent agreement between the ABA and the Justice department to

dismiss the case, the ABA promised to amend their rules to provide a less restrictive business structure in which licensed lawyers would be permitted to practice law.

18. **In 1983**, after five years of study and pursuant to the agreement, the official ABA Rules Committee (Kutek Commission) proposed the less restrictive modified rules to the ABA House of Delegates (HOD) for approval. (**Exhibit 2**, click here.)

19. The HOD, which acts as the "legislature" of the ABA, rejected the less restrictive proposed rule modifications, without concern for the "public interest", because the modifications would result in increased competition that would reduce their incomes, and approved the prior "lawyer only" ownership rule as described above without modification. (See, HOD transcript, **Exhibit 3**, and **Restrictive rule, Exhibit 4,** click here.)

20. **In 1999** the ABA HOD rejected a similar modification which had been recommended by the ABA rules committee , and on July 1, 2009 the State of Illinois adopted new Rules of Professional Responsibility, which contain the same obsolete Rule 5.4, and become effective on January 1, 2010.

### Obsolete

21. **ABA Rule 5.4**, which prohibits lawyers from practicing law in any form of conventional business organization in which a non-lawyer owns stock or has an ownership interest of any kind, has remained unchanged for over 40 years, and still keeps legal fees artificially high by restricting competition. It **pre-dates allowing lawyers to advertise, does not reflect the evolution of our society, and does not meet the public interest needs of consumers today.**

22. For example, **allowing licensed lawyers and traditional law firms to become corporate partners with large internet media companies such as Yahoo, Microsoft and Google could greatly reduce legal fees, and increase access to legal information for consumers, with little risk of harm to the general public because of the clear division of labor.**

### Selective Enforcement

23. For more than a generation state attorney regulation organizations, including Illinois, have **"looked the other way"** while license lawyers, who were bank employees, prepared wills and trust agreements for the Bank's customers, which is technically improper and the Unauthorized Practice of Law by the bank under Illinois Rule 5.4.

### PRIOR LITIGATION BETWEEN THE PARTIES

**LAWLINE v. American Bar Association, 956 F.2d 1378 (7th Cir. 1992, cert denied 510 U.S. 992 (1993)**

24. Since 1994 LAWLINE v. ABA has been the leading case regarding Multidisciplinary Practice (MDP's) and the business structure under which attorneys may practice law. **(See, Comment on Report and Recommendations of ABA Commission on Multidisciplinary Practice submitted by L. Harold Levinson, July 29, 1999 - Exhibit 5,** click here).

25. **In 1983**, after five years of study and pursuant to the agreement, the official ABA Rules Committee (Kutek Commission) proposed the less restrictive modified rules to the ABA House of Delegates (HOD) for approval.

26. The HOD, which acts as the "legislature" of the ABA, rejected the less restrictive proposed rule modifications, without concern for the "public interest", because

the modifications would result in increased competition that would reduce their incomes, and approved the prior "lawyer only" ownership rule as described above without modification. This rejection by the HOD was lead and coordinated by the Illinois Stete Bar Association. (See, HOD transcript, **Exhibit 3,** click here.)

27. In 1991 LAWLINE and  Holstein pioneered and developed legal advice through 900 numbers as an inespensive and innovative delivery system to augment the prior LAWLINE services. (**Exhibit 6.** Click here).

28. In 1996, LAWLINE and Holstein pioneered and developed of online internet streaming audo injfornation withou charge as an innovative informsation delivery system to augment the prior LAWLINE services.  (**Exhibit 7.,**Click here).

29.  In 1997 LAWLINE and Holstein began giving workshops at the annual ABA Technology Show, on the innovative use of descriptive internet domain names, streaming audio, internet radio and internet television programs via lawradio.com and lawtv.net to deliver free legal information to augment the prior LAWLINE services.

30. **In 1999** the ABA HOD rejected a modification to Rule 5.4, which had been recommended by the ABA rules committee ( See, **Exhibit 8,** click here).  This recommendation modification was similar to the 1983 Rule that the HOD had rejected in 1983.

31.  **ABA Rule** 5.4 which prohibits lawyers from practicing law in any form of conventional business organization in which a non-lawyer owns stock or has an ownership interest of any kind, **has remained unchanged for over 40 years, and still keeps legal fees artificially high by restricting competition.**

32.  **It pre-dates allowing lawyers to advertise, does not reflect the evolution of our society and does not meet the public interest needs of consumers today.**

33.  It is also embodied in the "lawyer only business organization structure" that is required to register for mandatory electronic filing in the Bankruptcy Court of the Northern District of Illinois, Eastern Division, which is challenged herein, as it keeps the legal fees artificially high for consumers in financial need who are trying to save their homes from foreclosure through Chapter 13 reorganization.

34.  The mandatory electronic filing rule is overbroad and does not distinguish between the business entity that is doing the mechanical filing of a client's case, and the licensed lawyer that is actually representing the debtor and appearing before the court.

35.  The public policy underlying the Sherman Antitrust Act favors competition, and is founded upon the policy that increased competition stimulates lower prices in the public interest.

36.  The mandatory electronic filing rule is overly restrictive.

37.  **A less restrictive provision such as the original modification which was recommended for ABA/HOD approval in 1983, (Exhibit 2, click here) can adequately safeguard and protect the general public without restricting competition in a manner that overly protects the economic interest of licensed lawyers who are practicing under a traditional law firm structure in which only licensed lawyers may own stock or or have any other ownership interest .**

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

## Preadoption hearings and debate

38. The provisions of bankruptcy court electronic filing rules had been the subject of several conferences prior to the version adopted by the Bankruptcy Court in the Northern District of Illinois .

39. The version adopted in the Northern District is among the most conservative of the variations that have been adopted across the country.

40. The Northern District Rule requires lawyers to waive the traditional Notice Rule regarding routine motions as a mandatory condition precedent to electronic filing registration.

41. The Bankruptcy Courts in other federal districts, who were aware of this built in problem, adopted a less restrictive version of the electronic file rule that allows lawyers who file a limited number of bankruptcy cases to register for electronic filing without requiring lawyers to waive the traditional Notice provisions.

## Elderly attorneys and part time practioners

42. **The bankruptcy court for the Northern District improperly restricts competition from non- regular bankruptcy filers**.

43. The Northern District Rule does not have an exception for lawyers who only file a few cases per year, **such as woman lawyers with small children who only practice law part time, and elderly lawyers who only file a few cases per year to augment their retirement income.**

44. Most violatile of the Sherman Act and the Civil rights law is the overly broad and excessively restrictive provision that only allows law firms, that are entirely lawyer owned, to file a bankruptcy case, even through a licensed lawyer files the appearance and

does the legal work related to the representation of the bankruptcy client. This blanket prohibition excessively restricts competition from any business entity other than the traditional entirely lawyer owned law firm, and keeps attorneys excessive high.

### Impeding the public Interest and poor persons

45.  On July 1, 2008 the Supreme Court of Illinois under Rules 716 and 756 permitted retired, inactive and corporate attorneys to perform pro bono work for individuals of limited means and for charitable, and community organizations. However, the Bankruptcy Court has not made any revisions or exceptions to the mandatory electric filing rule which would facilitate the implementation of this program

### Cost reduction in the Bankruptcy Court Clerk's Office v. Impeding Access to the Bankruptcy Court

46.  The bankruptcy court has greatly reduced the administrative cost of operating the Bankruptcy Clerk's office through the implementation of electronic filing since July 1, 2005, but has also increased the filing fees paid by consumers.

47.  During the same time period, the Chapter 13 attorneys fees, which are routinely approved by the bankruptcy judges without detailed review under bankruptcy court's standing orders, have risen disproportionately from $ 2200 to $ 3500 to the detriment of consumer debtors.

48 . This disproportionate increase in the court allowed attorney's fees has impeded affordable access to the courts for the members of the general public who most need affordable access to the bankruptcy court because they are trying to save their homes from foreclosure through Chapter 13.

49. Bankruptcy Court Administration in the Northern District is similar to the "Cycle of life" in the Disney's movie, "The Lion King". U.S. Trustees come and go, depending on the political party that is in power in Washington D.C., and whether they have a debtor or creditor orientation.

50. Perhaps the most evident example of this was when M. Scott Michel , who was the son of the Republican House leader, was appointed the U.S.Trustee for the Northern District of Illinois at the time when the original LAWLINE v. ABA arose (**Exhibit 9**, Click here).

51. Court administration is always a public policy choice of balancing the equities of the economies of case administration against the cost charged consumers for access to the courts.

52. In the case of the bankruptcy court for the Northern District, the court made the wrong public policy choice when it decided to reduce the cost of the clerk's office, which resulted in less competition, higher legal fees, and impeded access to the courts for consumers,   who are the person's most in need of bankruptcy reorganization relief to save their homes from foreclosure in these difficult economic times.

### **Flaw in the Original LAWLINE Case – Footnote 2**

53. Few legal scholars, courts, or law school case books have addressed a significant flaw in LAWLINE v. ABA which distinguishes the case.

54. This flaw is provided in footnote 2, of the 7th Circuit Court of Appeals (**Exhibit 10**, click here ), namely, that on the morning of the appellate court oral argument before the 7th Circuit Court of Appeals,  the State of Illinois and the federal defendants began their oral argument by informing the court, without notice to the

plaintiffs, that "all ethical charges, which they had brought against the plaintiffs, had been

dismissed, and that all issues were moot", because the acts done by LAWLINE, its

affiliated lawyers, law professors, personnel,  members and volunteers had been

supervised by licensed lawyers.

55.  **In advising the 7th Circuit Court of Appeals that Lawline and the other**

**Plaintiffs had not acted ethically improper, and that all issues were moot, the state**

**and federal defendants made no comment on, or reference to, the ethical propriety**

**of the primary issue involved in the case. Namely, that the acts done by LAWLINE,**

**its affiliated lawyers, law professors, personnel,  members, and volunteers between**

**1979 and 1992 had been done under lawyer supervision while the lawyers were**

**working under the business structure of an MDP,** which was comprised of lawyers

and non-lawyers, as the Plaintiffs had admitted and plead in the Plaintiffs' Complaint

### Illinois Rule 1.2 and creation of case and controversy by filing pro se cases

56.  Illinois Rule 1.2 of the Rules Professional Conduct prohibits lawyers from

taking certain actions on behalf of a client **"except that the lawyer may advance such**

**claim or defense if it can be supported by a good faith argument for and extension,**

**modification, or reversal of existing law".**

57.  **For 12 years subsequent to footnote 2** of the he decision in LAWLINE v.

ABA, **LAWLINE**, its affiliated lawyers, personnel, volunteers, and members continued

to answer free legal questions for the general public, refer cases,  and **represent clients**

**openly as an MDP**  of lawyers and non-lawyers without further allegations of

impropriety  by the former State of Illinois or by the former federal defendants, until

2005, when the coordinated actions of the former State of Illinois defendants and the former federal defendants, similar to original case, begin again.

58. That Lawline, under the supervision of licensed lawyers, frequently prepared bankruptcy documents at a nominal charge for consumers who filed pro se, and would have a licensed lawyer appear at bankruptcy first meetings to represent the debtors for a charge of $50, which greatly reduced the cost of doing a simple bankruptcy for consumers and facillated consumer access the courts.

**<u>The Pro-se Cases</u>**

59. In June 2005, as the effective date of the Mandatory Electronic Filing Rule approached, Plaintiff Holstein, as Administrator of LAWLINE, informed certain individuals associated with LAWLINE:

1. that, after over a year of researching the issues, and reaearching the mandatory conditions precedent to registering for electronic filing, Holstein had decided to decline registering for electronic filing,
2. that Holstein had decided to refrain from lying about "working for an entirely lawyer owned law firm", as a condition precedent to register for electronic filing, and
3. that Holstein had decided to challenge the Mandatory Electronic Filing Rule pursuant to Illinois Rule 1.2.

60. That on June 16, 2005 several persons associated with LAWLINE resigned, including Holstein's former "personal assistant", Lisa Vega.

61. That between June 16, 2005 and July 1, 2005 Holstein received an email from Bankruptcy Chief Judge Wedoff which stated in pertinent part that:

"On July 1, 2005 electronic filing (with a valid ID and password) will be mandatory. If you attempt to file a document without your password after that date, the document may be denied filing"

62. That, upon information and belief, and upon almost 20 years of acquaintance and colliegial academic interaction between LAWLINE, Holstein and Nelson with Judge Wedoff, regarding various successful and unsuccessful efforts by LAWLINE, Holstein, Nelson, and members of the Chicago Association of Bankruptcy Lawyers (CABAL) to overturn "legally improper" but "admministratively effective" uniform procedures that had been adopted by the judges in the Bankruptcy Court, Judge Wedoff **anticipated and expected** LAWLINE and Holstein to legally challenge the Mandatory Electronic Filing Rule at the time he sent his email. (See fee cut cases and Coar, and various motions, transcripts, recordings, and notes of open Bankruptcy Court/attorney co-ordination meetings regarding objections to the Bankruptcy Court order mandatitory the use by debtor's attorneys of a "Uniform Chapter 13 Plan", and the inclusion of improper financial inducements of higher fees if the debtors' attorneys used the "uniform attorney/client contracts" prepared by the Bankruptcy Court.)

63. That in early July of 2005 Vega telephoned Holstein, and requested to retun to LAWLINE.

64. That LAWLINE, and plaintiff Holstein as a lawyer for LAWLINE , had filed no Bankruptcy cases between July 1, 2005 and July 13, 2005.

65. That on July 8, 2005 although very ill from the symptoms of a chronic and progressive health condition that Holstein has had since 1966, Holstein met with Vega in Chicago and gave Vega instructions for filing future cases, while Vega wrote contemporeous notes

16

66.  That copies of thes notes, in Vega's handwriting, are attached hereto and made a part hereof as (Group **Exhibit 11,** click here)..

67.  That on July 8, 2005 Holstein, as Administrator of LAWLINE, directed Vega:

1.  to file the Morton Smith case, and other future cases "pro-se",

2.  to file the Morton Smith case, and other future cases "Petition Only",with the required filing forms,

3.  to file Holstein's appearance manually when she filed the "Schedules" and "statement of afffairs" 14 days later,

4.  to have Holstein's name and address on the automatic stays as attorney for the debtor at the time she filed the petitions,

5.  to stamp these automatic stays at the filing desk when the case was filed,

6.  to send these automatice stays to the creditors to protect the debtors,

7.  to call the important creditors, to immediately stop any foreclosures or repositions (See, Group Exhibit 12 and Exhibit 12a, click here), and

8.  to use the "Lawline Client Fund Account" to pay the filing fees on the "pro-se" cases".

68.  That subsequent to this meeting Holstein:

1.  came into Chicago on less than five occasions between July 8, 2005 and December 30,2005 because of his illness,

2.  interacted and supervised Vega exclusive by phone,

3.  never saw the the documents that Vega had drafted, prepared for filing, and physically filed with the Bankruptcy Court before they were filed, and

4.  concealed his illness, excessive weight loss, loss of control over certain bodily functions, and deterorating physical appearance for male pride and vanity purposes by leading Vega to believe that he was excessively drinking and depressed.

69.  That for reasons known only to Lisa Vega, Vega:

   1.  did not accurately follow all of Holstein's instructions from the meeting between Holstein and Vega on July 8, 2005,

   2.  manually "blacked out" certain information on the documents after they were prepared in the bankruptcy computer software and after they were printed,

   3.  created a final version of these documents by hand that Holstein could not remotely review over the internet before they were filed, and

   4.  filed the "pro-se" bankruptcies with the Clerk of the Bankruptcy Court giving the clerk on duty her Illinois State I.D. Card for the filing desk clerk to copy.

70.  That in January 2009, Vega retracted her prior sworn material false statements before the Grand Jury that "Holstein had told her to "black out" the information" on the Petitions, Schedules, and Statements of Affairs, that she had filed with the Bankruptcy Court.

### Paying the filing fees and Chase Bank

71.  Alfred Levinson is currently a Circuit Court Judge of Cook County for the Third Municipal District in Rolling Meadows, Illinois.

72.  For at least 25 years, from the late 1970's through June 2005 when he became a Circuit Court Judge, Levinson was one of the attorneys associated with LAWLINE and Holstein in the referral of complex Family Law cases (See, the Mahaffee Illinois lottery case, **Chicago Law Bulletin Article, June 17, 1991, Exhibit 13,** click here), (See, Mead case, **Exhibit 14,** click here), and serious Criminal Law cases. **(Exhibit 15,** click here) e.

73.  From 1988 through 1992 Levenson was co-counsel with Holstein in the original ABA litigation regarding Rule 5.4. Levinson was also one of the attorneys of record for Holstein, Nelson, and LAWLINE in the ABA case.

74.  In addition, Levinson had personally represented Holstein in post judgment divorce litigation, had revised Holstein's will, and had acted as "corporate counsel" for LAWLINE when it was an **Illinois Not For Profit Corporation** (#_____). **(Exhibit 16,** click here).

75.  **In 1989 during the District Court phase of the original Lawline v. ABA case, Holstein, acting as CEO of LAWLINE, and acting as co-counsel with Alfred Levenson, directed Levinson to open a new LAWLINE business account (#_____) and a new LAWLINE client fund account (#_____) at the Clark and Elm Street branch of First National Bank of Chicago for the specific and intended benefit and use of Holstein and LAWLINE.**

76.  Although Levenson had never maintained an office at 109 West Elm Street, Chicago, Illinois, and had never received mail at that address, Levinson had all statements and communications regarding these new LAWLINE accounts sent to the LAWLINE headquarters at 109 West Elm Street so that these accounts could be monitored and reviewed by Holstein, Nelson and entities associated with LAWLINE.

77.  Since 1980, LAWLINE'S's national headquarters has been continuously located less than 100 feet from the First National Bank (Chase) (Bank One) (Contenental Bank) branch bank at Clark and Elm Street, Chicago Illinois.

78.  As payment and compensation for the above legal services to Holstein and LAWLINE, Levenson received free referral cases from LAWLINE, plus a 50% division of **all attorney fees** on the Mahaffee Illinois lottery case, (See, **Chicago Law Bulletin Article, June 17, 1991, Exhibit 11,** <u>click here</u>), **although Levinson had not been an attorney of record at the successful trial level on the Mahaffey Illinois lottery case.** (.

79.  In the Spring of 1990 Levenson added Holstein and Nelson as authorized signaturies on the new LAWLINE accounts **in accord with the Illinois ARDC "CLIENT TRUST ACCOUNT HANDBOOK", (Exhibit 17,** <u>click here</u>), which was last revised on July 31, 2007.

80.  On January 27, 2009, **Levinson acknowledged under oath the authenticy of his signature on a first geneation copy of this signature card, as the original signature card had been "lost" or "misplaced" by Chase, according to the sworn testimony of a Chase Bank official.**

81.  In 1990 Holstein registered the LAWLINE CLIENT  Fund Accout # _____ as his official client fund account.

82.  This account was subsequently re-registered annually as Holstein's and LAWLINE's official client fund account through 2005 and the initiation of the matters herein. (See, copy of Holstein/"Leveinson" LAWLINE CLIENT FUND ACCOUNT REGISTRATION, and copy of LAWLINE check issued by Holstein to pay for registration, **(Exhibit 18,** <u>click here</u>).

83. At all times from 1979 through the present day, no entity or person could use the trade name LAWLINE in the State of Illinois except Holstein , or some acting under his direction and control pursuant to trademark 47960.

84. In furtherence of this exclusivity LAWLINE and Holstein successfully brought a trademark infringement suit in the United States District Court of the Northern District of Illinois **to protect the trademark/tradename "LAWLINE" in the case of Lawline and Holstein v. Schnurman, et al, case #: 99-cv-04497.**

85. **For the next fifteen years from May 1990 through the effective date of the new bankruptcy law on October 17, 2005, these LAWLINE accounts, as described above, with "LAWLINE" clearly printed on the face each check, were issued by Holstein and Nelson to file and pay the filing fees on over 1408 bankruptcy cases with the Clerk of the Bankruptcy Court.**

86. Photographs of each and every LAWLINE check that was used to file those 1408 cases between 1990 and and 2005 were taken at the time of filing by the Office of the Clerk of the Bankruptcy Court, are in the possession of the Office of the Clerk of the Bankruptcy Court, and are accessible to the Office of the United States Trustee, but were never reviewed by the Office of the United States Trustee during their inadequate inquiry regarding the matters herein.

87. On or about _____ Levinson telephoned Holstein and informed Holstein that the ARDC had contacted him regarding the LAWLINE Client Fund Account, in accord with the Attorney Client relationship.

88. Levinson also informed Holstein that he was being interviewed for a Cook County Circuit Court judgeship, stated that he "did not want any problems", and

**requested Holstein to remove his signature from the LAWLINE Client Fund
Account.**

89. On _____ , in accord with Levinson's request, Holstein went to the Near
North Branch of Bank One (Chase), and met with an account executive who prepared the
documents to remove Levinson's signature from the account.

90. Holstein signed his name and the name of his late wife and Lawline partner,
Lenore Nelson, to the documents that the account executive had prepared, duplicating the
original signature card from 1990, except for the removal of Levinson's signature.

91. "Lenore Nelson" was included as a "strawman" signatory on the account
because of the business need for a "female voice" to protect the client's interest, conduct
LAWLINE business, and transfer funds by telephone when Holstein was out of town, ill,
or could not otherwise be reached in an emergency.

92. In the fall of 2005 the LAWLINE accounts were mysteriously frozen by
Chase Bank , without notice to Holstein or LAWLINE, and Chase refused thereafter to
give any information regarding the accounts to Holstein and LAWLINE.

93. Ironically, Holstein still had online access to the view the accounts, although
the funds were frozen.

### Judges and lawyers associated with LAWLINE

94. In the 1970's and 1980's Holstein taught over 1700 law students that are
currently practicing lawyers in the greater Chicago area.

95. Approximately 20 of these former law students are current Judges in Cook,
DuPage, Lake, Will and Kane counties. A few have earned their pensions and are retired.

96.  Between 1978 and the present date several hundred licensed lawyers, law firms, and public service organizations have been associated with LAWLINE and Holstein.

97.  Many of the lawyers that were associated with LAWLINE, but were not former students of Holstein, are also currently judges, similar to Alfred Levinson, who was Holstein's and LAWLINE's attorney in LAWLINE v. ABA et al., as described below.

98.  Almost all of these current or retired judges that were associated with LAWLINE remained silent about their prior association with LAWLINE and Holstein during the official judicial interview process, because LAWLINE was not an "entirely lawyer owned law firm", was branded by some lawyers as"unethical" and prohibited by ABA and Illinois Disciplinary Rule 5.4.

**Plaintiff**

99.  Plaintiff Holstein, d.b.a. LAWLINE, lawline.org, and currently associated with **lawyernetwork.com** resides in Wisconsin,  but maintains an office within the Northern District of Illinois.

100.  Thomas Holstein was educated at Cambridge University, the University of Notre Dame, DePaul University, the Rene Cassin International Academy of Human Rights in Strasbourg  France, and at The Hague Academy of International Law with a consentration in statutory drafting, intrepetation and application. Holstein also served as an officer in the USMC between undergraduate school and law school.

101.  Holstein began teaching law school as a law professor at the University of West Virginia in 1974, teaching statutory business courses such as Article 3,4, and 9 of

23



the Unifirm Commercial Code (UCC), commonly known at that time as commercial paper, commercial law, secured transactions, "money credit and banking", debtor-creditor relations, businiss organizations and corporate bankruptcy reorganization under the Bankruptcy Reform Act of 1978, which replaced the Bankruptcy Act of 1898 on October 1, 1979.

102.  Since 1978, in addition to teaching law school and private consultation with law firms regarding statutory intrepretation, application, and stratagic planning, plaintiff has openly and continuously performed acts which constitute the "practice of Law" as the Administrator of LAWLINE, in association with licensed lawyers and non-lawyers, in an alternative business structue to conventional  law firms law firms that are owned entirely by lawyers.

103.  On July 1, 2005, although the Plaintiff was fully licensed and authorized to practice law in the State of Illinois, the Federal District Court for the Northern District of Illinois, and the 7th Circuit Court Court of Appeals, and although Plaintiff was the former president of the Chicago Association of Bankruptcy Lawyers, and although the Plaintiff had taken the required electronic filing course, the Plaintiff was prohibited from registering to electronically file Bankruptcy cases because the registration form required him to state under oath the he worked for an "entirely lawyer owned law firm" as a condition precedent to registration.

104. While several federal district court electronic filing rules across the country may be similarly constitutionally infirm, the Bankruptcy Court electronic filing rule is specifically challenged herein because its application;

1. Reduces competition among licensed lawyers in bankruptcy, Chaper 13, and Chapter 11 cases.

2. Prohibits non-lawyers to enter into association with lawyers to obtain meaningful and affordable consumer access to the Bankruptcy Court, and

**3. Results in consumers paying uniform higher attorney fees, that are routinely granted under a "standing order" by the Bankruptcy Court judges** against Chapter 13 consumers seeking to save their homes from foreclosure, which is contrary to the spirit and underlying policy of the Sherman Act, and violative of Section 1983 of the First Amendment, the Due Process Clause, and the Equal Protection Clause.

### The LAWLINE

105. In 1978, after the United States filed the antitrust suits against the ABA as described above, LAWLINE was founded as a national public service pilot project, and as a clinical independent study program for law students at Northern Illinois College of Law. (formerly Lewis University College of Law). The founders included several law professors from across the country, a former democratic congressman from New York, several licensed lawyers, and a group of community organizers.

106. Professor Holstein was the original LAWLINE Administrator, and the youngest of the founding law professors.

107. The LAWLINE concept of funding a national "private sector" legal informatiom program by the voluntary exchange of case referral fees between licensed

lawyers was conceived by former New York congressman, law professor, and political activist Allard Lowenstein who was also one of the original LAWLINE founders.

108.   Illinois was selected as the location for the national pilot project because Illinois was the first state to liberalize the traditional "referral fees" ethics cannon between licensed lawyers and law firms.

## Illinois Rule 2-107

109.   Illinois Rule 2-107 was the first ethics rule in the United States to allow licensed lawyers to share fees with each other based upon the benefit conferred upon the client when the client was referred to an experienced lawyer/law firm, that concentrated his or her practice in the specific legal area of the client's case.

110.   Prior to Illinois Rule 2-107, lawyers/law firms could only share fees on the basis of respective legal "work done" on each case.

111.   This unique Illinois rule would subsequently be adopted by the ABA, federal courts, and over 40 states. (See, Rule 2-107 of the Illinois Code of Professional Responsibility (1979), and Holstein v. Grossman, 246 Ill.App.3[rd] 719, 616N.E.2d 1224 (1993).

112.   LAWLINE was composed of over 20 specialized practice groups with several hundred licensed lawyers providing free legal information to consumers, corporate officers/employees, government employees, officers and employees of financial institutions, corporate human resource departments, battered woman's centers, landlord/tenant organizations, gay rights organizations, police brutality victims, femenist

groups, discrimination victims, legal aid organizations, minors who were charged with

school suspension/expulsion, immigrant detainees, law students, U.S. military personnel,

and licensed lawyers charges with advertising violations. (See, Robert J. Adams, Jr., et

al., v. ARDC, 801 F.2d 968 (7th Cir. 1986), which was organized by Holstein as

administrator of LAWLINE, and which arose from a telephone call to LAWLINE from a

young Illinois lawyer who could not afford to pay for his legal defense before the ARDC,

and had mailed foreclosure letters to consumes losing their homes.)

113. The original purpose of LAWLINE was:

1. To use lawyers, law students, and paralegals, acting under lawyer
supervision, to answer legal questions for members of the general public over
the telephone without charge.

2. To assist members of the general public in pro se representation, routine
administrative proceedings, and meaningful access to the courts

3. To make referrals to public and private agencies providing free legal
services;

4. To refer members of the general public with limited financial resources to
lawyers who charged reduced fees; and

5. To create a prototype legal delivery system, that would be funded by
voluntary case referral fees between lawyers, as a marketplace alternative to
the conventional practice of law by traditional entirely lawyer owned law
firms, and as an alternative to government subsidized aid clinics.

114. From its founding, the LAWLINE agenda was discussed and reviewed by

the voluntary LAWLINE ADVISORY COMMITTEE. Tis committee included the

founding law professors, large law firm partners, ABA officers, government lawyers, retired judges, former presidents of the National Academy of Matrimonial Lawyers, and the American Trial Lawyers Association (ATLA), and was coordinated by legal ethics professor and founding Illinois ARDC member Arthur Scheller, acting in conjunction with administor Holstein.

115. Other prominent lawyers and judges, who were not Advisory Committee members, also voluntarily discussed legal issues with members of the LAWLINE Advisory Committee. These discussions were not related to any case in which they were involved.

116. These voluntary consultants included former Watergate, county and state prosecutors, state and federal judges, ARDC members, HALT, community organizers, and the consumer columnist for the Chicago Sun Times.

117. LAWLINE was taken entirely into the private sector as a association of lawyers and non-lawyers, similar in structure to the structure of the ABA, in the 1980's when Northern Illinois College of Law, reflecting the Ronald Reagan Administration policies of the time, attempted to place overbroad restrictions on the type of legal information and free legal advice that licensed LAWLINE lawyers, and paralegals, operating under lawyer supervision, could dissiminate by telephone, and on the type of pro bono consultation and advise that LAWLINE could give.

118. Since 1978 LAWLINE, licensed lawyers, law professors, Holstein, and paralegals, operating under lawyer supervision, have answered free legal questions for over 2,500,000 people, made referrals, subsidized pro bono litigation, provided free consultation to young lawyers charged with advertising/marketing violations by the

ARDC, participated in public service "watchdog committees" that uncovered improprieties within the Illinois ARDC, (See, Exhibit 19, click here), defended lawyers charged with violating the Illinois rule on advertising, , successfully challenged and overbroad state advertising rules before the 7th Circuit Court of Appeals,, overturned improper uniform procedures that harmed consumers which were implemented by the Bankruptcy Court and the Office of the Bankruptcy Trustee, , testified before the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, , established inexpensive telephone 900 #'s in several consumer areas, posted streaming audio legal information for consumers on the internet in 1996, and taught numerous public service workshops on the innovative electronic delivery of legal services at the annual ABA Technology Show (Conference), and at state bar association conventions.

119. none

## Defendants

## ABA

120. Defendant ABA is the largest legal trade association in the United States with over 400,000 members, and has its headquarters located within the Northern District of Illinois.

121. The stated mission of the ABA is to "provide law school accreditation", "to assist lawyers and judges in their work" and "to improve the legal system for the public". (See, **Exhibit 20**, click here).

122. ABA certification of a law school is required by most states as a gateway to law practice before its' graduates are permitted to take the state Bar exam to become a

licensed lawyer, and law schools uniformly teach their students the ABA rules across the country.

123. For several generations official ABA committees of legal scholars and law professors have:

1. drafted and proposed rules of professional conduct,
2. formally recommended these rules for approval by the ABA HOD as part of the ABA stated mission to serve the public interest, and
3. made these rules available to state and federal courts for adoption.

124. This ongoing and continuous process:

1. saves the state and federal courts several $ 1,000,000 each year in duplicative research, tedious judicial review, and custom drafting expenses,
2. confers a cost saving benefit to underfunded state and federal courts, but
3. provides a potentially improper financial inducement/insentive to adopt their rules, and
4. presents an apparent conflict of interest to members of the general public.

125. This financial inducment and economic benefit offered to the courts by the ABA:

1. is readily accepted by the "purportedly" independent judiciary since the ABA Rules are adopted by the courts with minimal independant judicial review or modification,
2. gives the appearnce of ethical impropriety to the general public when an overly broad and economically self serving rule, such as 5.4, is bundled into the "public service package" of ABA rules, much like a "Trojen Horse", as was the blanket prohibition on lawyer advertising in the past, and
3. promotes the hidden agenda of the ABA to dominate the United States market for legal services in the economic self interest of "entirely lawyer owned traditional law firms" by limiting competition among lawyers by broadly restricting the business structure under which licensed lawyers may compete and practice law.

Case 1:09-cv-06239    Document 1    Filed 10/06/2009    Page 31 of 69

Every state has a rule proscribing investment in law firms in accord with ABA Rule 5.4.

126. Many federal courts, including the Bankruptcy Court of the Northern District of Illinois, have made conformity with ABA Rule 5.4 a condition precedent for a licensed lawyer to register for electronic filing

127. Law firms and innovative private sector legal delivery clinics, such as LAWLINE, that provide consumer information, advice and services cannot access capital markets, limiting their opportunities for expansion, curtailing investments in technology and training, restricting competition, and keeping attorney's fees artificially high.

128. Every state jurisdiction except the District of Columbia prohibits lawyers from entering into a business association with non-lawyers as partners and/or stockholders, if the business provides legal services.

129. This blanket prohibition against non-lawyer investment and participation in law firms and clinics has long hindered the development of the legal profession to help consumers obtain affordable legal services, to obtain legal information, and to access the courts with no signs of change.

130. The situation of the contemporary marketplace for legal services today, the totality of the of surrounding circumstances, and the repeated uniform pattern of the ABA House of Delegates in rejecting any modification of Rule 5.4 for ____ years since 1983, clearly distinguishes the original LAWLINE v. ABA case from the instant case and mandates a different result.

131. The "purportedly" independent judiciary and rule makers" have improperly delegated state duties and responsibilities to the ABA, and the ABA has accepted these improperly delegated state duties and responsibilities.

132. This delegation and acceptance compromises the traditional "independent decision making" and traditional immunity of both groups.

133. The pervasive dominence of the ABA over lawyers through indoctrination and peer pressure described above is similar to an old vine that has its roots on your neighbor's property, but dominates your garden on the other side of the property line.

134. It has become inexorably intertwined with the "independent" state and federal decision makers, who are the component parts of the official state and federal judicial committees that routinely adopt the ABA Rules.

135. Over the last 40 years the ABA has taken no adminstrative internal action to balance the repeated pattern of its House of Delegates, acting in violation of the ABA stated purpose, regarding the HOD's rejection of the Official ABA Rules Committee recommendation to modify the overbroad prohibition on Rule 5.4.

136. The ABA has a defective and disfunctional Adminstrative Structure that lacks the necessary checks and balances to protect the public interest.

137. It is time to end this transparent "separate but dominant" status of the ABA, since the ABA HOD has repeatedly and uniformly rejected the Official ABA Committee's recommendations to modify Rule 5.4 for 26 years, since the HOD initial rejection in 1983, and for 33 years since the U.S. Justice Department first brought the original antitrust suit against the ABA in 1976 for limiting competition, and improperly restricting affordable consumer access to legal information and the courts.

## First NationalBank/Bank One/Chase

138. For many years, prior to becoming the full time Administrator of Lawline, Holstein had lectured on legal ethics and taught business organization, agency and partnership, secured transactions, bankruptcy law and commercial paper while he was a full time law professor.

139. During the original Lawline v. ABA case new LAWLINE business and client fund, for the specific intended benefit and use of LAWLINE, and Holstein were opened at First National Bank of Chicago, at Holstein's direction, by one of LAWLINE's attorneys of record who was also co-counsel in the litigation with Holstein.

140. For the next fifteen years these LAWLINE accounts, with LAWLINE clearly printed on the face of the checks, were used to file all LAWLINE cases, except for approximately 1% of the cases in which the client had paid his or her their filing fees in money order or cash.

141. Almost all of the checks were issued, in accord with the Illinois rules which allow non-lawyers to be signatories on lawyer client fund accounts, upon the signature of Lenore Nelson, a non-lawyer, who was LAWLINE's office manager, and had been a plaintiff in LAWLINE v. ABA.

142. These checks included several hundred LAWLINE checks written as "pay to the Clerk of the Bankruptcy Court", upon the signature of Holstein and Nelson, and were also used exclusively to pay filing fees in the Northern District Court, the state courts, and to pay licensed Illinois lawyers who appeared daily in court on routine matters and at Bankruptcy First meetings.  .

143. During this 15 year period, First National Bank had bank had been taken over by "First Chicago", Bank One and Chase

144. In 2003, after a 20 year association with LAWLINE, this attorney told Holstein that he was being considered for a Circuit Court judgeship, and requested Holstein to remove his signature from the LAWLINE bank accounts. Pursuant to this request, Holstein removed the signature of this attorney from the account.

145. In 2005 the LAWLINE accounts were mysteriously frozen by Chase, without notice to Holstein or LAWLINE, and Chase refused thereafter to give any information regarding the accounts to Holstein and LAWLINE. Ironically, Holstein still had online access to the view the accounts, although the funds were frozen.

146. Between 2002 and 2006 the governmental defendants in LAWLINE v. ABA, through a new generation of licensed lawyers and employees, who were children during the original case, have wrongfully conspired and coordinated to put LAWLINE out of business, without making a sufficient or adequate inquiry as required under Rule

147. This conspiracy in restraint of trade is ongoing and continuous through the present date.

148. The actions of the defendants in the instant case are much more excessive and ethically improper than in the original LAWLINE v. ABA case, which reflects the decline of the practice of law from a "profession" in the "public interest" to a "business" during the last 20 years.

### The judicial defendants

149.  The judicial defendants itemized in the caption are sued in their judicial capacity only and reside or have judicial chambers within the Northern District of Illinois.

150.  Bankruptcy judges Goldgar, Schmetterer, Schwartz, Cox, and Barbosa are currently active members of defendant ABA according to the online biographies on their judicial websites.

151.  Bankruptcy Judge Goldgar was one of the defense attorneys in the original LAWLINE v. ABA Case.

152.  Judge Wedoff was Chief Judge of the Bankruptcy Court when the Bankruptcy Court Mandatory Electronic Filing Rule became effective on July 1, 2005 and barred LAWLINE, Holstein, and other licensed lawyers associated with LAWLINE:

1.  From the clerical act of filing bankruptcy cases;

2.  From paying the bankruptcy filing fees with LAWLINE checks in the manner the LAWLINE had filed and paid for over 1400 bankruptcy cases since 1990 when the original LAWLIN v. ABA case was pending, and

3.  **From making application to file bankruptcy cases electronically because LAWLINE was not an "all lawyer owned law firm", as required to make application to electronically file under the Mandatory Electronic Filing Rule.**

153. The current or past membership in the ABA of Judge Wedoff and the other judicial defendants is unknown at this time.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**Defendant Sandra Rasnak**

154.  Sandra Rasnak was admitted to the Illinois State Bar on November 5, 1979 and is is a long time career employee of the Office of the U.S. Trustee since the mid-1980's.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

155.  Upon information and belief Rasnak worked for and under Clifford Meachem, and U.S. Trustee, M. Scott Michel, who initiated the original charges against LAWLINE, Holstein and Nelson, **(Exhibit 9,** Click here**)**, that evolved into the original Lawline, et al. v. ABA case.

156.  M. Scott Michel is the son of Robert Michel, who was the Republican leader of the U.S. House of Representatives at the time that M. Scott was U.S. Trustee for the Northeren District of Illinois, and Clifford Meachem is currently a Cook County Circuit Court Judge.

157.  That Defendant Rasnak began working as a lawyer for the Office of the U.S. Trustee when Plaintiff was president of the Chicago Association of Bankruptcy Lawyers (CABAL).

158.  none

159.  That  at that time members of CABAL included the 12 largest law firm filers  of Chapter 13 debtor cases in the Northern District of Illinois,  and CABAL members filed apprioxamately 80% - 85% of the Chapter 13 filings in the Northern District by debtors that were trying to save their homes from foreclosure.

160.  That members of CABAL frequently took "consolidated action" to oppose questionable procedures employed by certain foreclosure and creditor attorneys, and

"consolidated action" against policies of certain Bankruptcy Judges who were considered to be "creditor oriented".

161. That during this period law professors associated with LAWLINE and Holstein provided members of CABLE with free memos, pleadings, discovery motions, adversary complains, and access to a "pool" of experienced lawyers to appear at court hearings and first meetings for Chapter 13 debtors trying to save their homes from foreclosure, and:

1. to keep the attorneys fees to a minimum for the debtors, and

2. to keep the overhead and costs low for young attorneys that desired to build a debtors' Bankruptcy practice.

162. In 2003, upon information, belief, and partial recollection, Rasnak, or someone acting under her supervision, initiated an inquiry into the "unauthorized practice of law" by LAWLINE, into LAWLINE's use of para-legals, and into LAWLINE's petition preparation.

163. That subsequently to receipt of Rasnak's inquiry Holstein met with a woman supervisor at the Office of the U.S. Trustee, believed to be Rasnak.

164. That this woman official at the Office of the U.S. Trustee and Plaintiff Holstein discussed several matters, including but not limited to, various ABA position papers on the use of "legal assistants", petition filing, and footnote 2 of the original Lawline v. ABA case.

165. That no motions were filed by the Office of the U.S. Trustee regarding these matters.

166. That, however, contemporaneous with the meeting with "Rasnak", described above, Holstein was contacted by one of the three Chapter 13 Trustees of the Northern District to schedule a private meeting.

167. That at this private meeting the Chapter 13 Trustee told Plaintiff Holstein:

1. that he/she had been given "marching orders" by the Office of the U.S. Trustee to "lean on" Holstein/LAWLINE's Office, and

2. that he wanted to "personally disassociate" himself from certain actions that his office had been ordered to take by the Office of the U.S. Trustee.

168. That on April 3, 2006, defendant Rasnak:

1. without making a reasonable inquiry,

2. with personal knowledge and/or with "reason to know" that her material statements were false,

3. acting contrary to, and in violation of, the scope and responsibilities of her employment, and

4. acting in overzealous furtherance of the Bush Administration "sting" operation known as "Operation Truth or Consequences",


**wrote a letter to Assistant U.S. Attorney Brian Netols stating:**

**1. The filing fees were paid not by Alfred L. Levinson but by Holstein, as he well knew. This method of payment removed Holstein's name from the docket sheet and therefore masked his role as the debtor's attorney.", and**

2. **that "Furthermore, Holstein deceived bankruptcy officials through false declarations and omissions on all nine of his clients' bankruptcy petitions, schedules, and SOFAs by blacking out his name and address that identified him as the debtor's attorney, when in fact, as he well knew, he was the debtor's attorney at the time of the filings."**

169. That for many years going back to the 1980's the clerical employees/cashiers at the bankruptcy court filing desk:

1. took photographs of all checks used to pay the filing fees on bankriuptcy cases at the time the filing fees were paid, and

2. from the early 1980's through at least October 17, 2005, only accepted cash, money orders, and/or cashiers checks to pay the filing fees on cases that were filed "prose".

170. That between October 15, 1993 and December 18, 2003 LAWLINE filed approximately 1400 bankruptcy cases. That the filing fees on these cases were, uniformly and exclusively, paid by LAWLINE checks, to give notice that LAWLINE was still "engaged in the practice of law "as an association of lawyers and non-lawyers as discussed in Footnote 2 of the ABA case , and in accord with ABA Rule 5.4 as recommended by the "Kutek" Committee of the ABA, and as rejected by the ABA House of Delegates in 1983.

171.That photographs of each of these checks were in the possession of the Clerk of the Bankruptcy Court, easily accessable to defendant Rasnak and to the Office of the U.S. Trustee.

172. That defendant Resnak's "deception" allegations in Rasnak's letter to Assistant U.S. Attorney, Brian Netols of April 3, 2006, regarding Holstein's use of the

"Levinson" LAWLINE checks to file the "pro se" cases, after he was prohibited from

registering for mandatory electronic filing by the order of July 1, 2005, were materially

false and made without an adaquate reasonable inquiry.

    173.  That these checks were properly issued by Lenore Nelson and/or Holstein

from the LAWLINE business and "Lawline Client Fund account" that were opened for

the benefit of Holstein and LAWLINE by Alfred Levinson, upon the direction of

Holstein, during the LAWLINE v. ABA case when Levinson was an attoney of record for

LAWLINE, Holstein, and Nelson, and co-counsel with Holstein. CASE at the direction

of Holstein, and upon which Holstein and Nelson were authorized signatories since at

least the Sprong of 1990.

    174.  That in 2003 the Bankruptcy Court Clerks Office modified the docketing

recording procedure, and the clerical staff at the bankruptcy filing desk began recording

the identy of the entity that paid the filing fees in the respective bankruptcy case , in

addition to the identy of the individual lawyer apearing for the debtor in the case.

    175.  That, upon information and belief, there were no specific written

insttructions for the clerical staff to follow in determining the identity of the entity that

paid the filing fees, or in the entry of this information on the official docket sheet.

    176.  That this docket entry was entirely subjective and determined by the

personal experience of the clerical filing desk attendant who was on duty at the time of

filing, and on the visual appearance of the printing on the LAWLINE checks as

individually perceived by that particular filing desk attendant.

    177.  Upon information and belief defendant Rasnak failed to make a reasonable

inquity of the pacer data base before writing to Assistant U.S. Attorney Netels in her

letter of April 3, 2006 letter that "Holstein deceived bankruptcy officials through the use of the Alfred Levinson Law Line account to pay all nine debtors filing fees."

178.  That 66 **official docket sheets** out of **90  bankruptcy cases filed with LAWLINE checks by Holstein/LAWLINE between 12/18/03**, after the clerical staff at the bankruptcy court filing desk began noting the identity on the docket sheets of the entity that paid the filing fees, and **8/23/05, note that the filing fees were paid by Holstein's registered Illinois trademark/servicemark, "LAWLINE",**

179.  That 8 **official docket sheets** out of **90  bankruptcy cases filed with LAWLINE checks by Holstein/LAWLINE between 12/18/03**, after the clerical staff at the bankruptcy court filing desk began noting the identity on the docket sheets of the entity that paid the filing fees, and **8/23/05, note that the filing fees were paid by "Holstein".**

180.  That **only 16 official docket sheets** out of **90  bankruptcy cases filed with LAWLINE checks by Holstein/LAWLINE between 12/18/03**, after the clerical staff at the bankruptcy court filing desk began noting the identity on the docket sheets of the entity that paid the filing fees, and **8/23/05, note that the filing fees were paid by "Levinson".**

1.  **that under the official docket sheets for cases filed between 12/18/03**, after the clerical staff at the bankruptcy court filing desk began noting the identity on the docket sheets of the entity that paid the filing fees, and **8/23/05:**

- **82.2 % of the cases filed with LAWLINE checks are noted on the official docket sheets as paid by Holstein's Illinois trademark /servicemark, "LAWLINE", or as paid by "Holstein", and**

- **only 17.7% of the cases filed with LAWLINE checks are noted on the official docket sheets as paid by "Levinson.**

181.  That defendant Resnak's "decepeion" allegations in Rasnak's letter to Assistant U.S. Attorney, Brian Netols of April 3, 2006 were materially false and made without an adaquate reasonable inquiry.

### Defendant Alfred Levinson

182.  Alfred Levinson is currently a Circuit Court Judge of Cook County for the Third Municipal District in Rolling Meadows, Illinois.

183.  For at least 25 years, from the late 1970's through June 2005 when he became a Circuit Court Judge, Levinson was one of the attorneys associated with LAWLINE and Holstein in the referral of complex Family Law cases (See, the Mahaffeey Illinois lottery case, **Chicago Law Bulletin Article, June 17, 1991, Exhibit 13,** click here), (See, Mead case, **Exhibit _14,** click here), and serious Criminal Law cases. (**Exhibit 15,** click here) web page.

184.  From 1988 through 1992 Levenson was co-counsel with Holstein in the original ABA litigation regarding Rule 5.4. Levinson was also one of the attorneys of record for Holstein, Nelson, and LAWLINE in the ABA case.

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

185.  **Plantiff Holstein incorporates, and realleges preceeding paragraphs ____ through ____ as paragraghs ____ to ____ herein**

186.  That on September 6, 2006 defendant Circuit Court Judge Levinson:

1.  knowingly breached the attorney client privelege regarding his former clients
    Holstein and LAWLINE,

2.  knowlingly made material false statements to Federal Secret Service
    Agents/Investigators Fredrick Day and Brett Colvine regarding his former clients
    Holstein, Nelson  and LAWLINE,

3.  knowingly made material false statements to Federal Secret Service
    Agents/Investigators Fredrick Day and Brett Colvine betraying his professional
    lawyer and non-lawyer LAWLINE collegues of at least 20 years, and

4.  knowingly made material false statements to Federal Secret Service
    Agents/Investigators Fredrick Day and Brett Colvine to conceal his 20 year
    association with LAWLINE

**to protect his judicial position and to avoid charges of unethical violations of Illinois
and ABA Rule 5.4 (See, Day summary of Levinson interview, Exhibit 21, click here)**

187.  **That  defendant Circuit Court Judge Levinson's repetitive and
knowingly false material statements to Federal Secret Service Agents/Investigators
Fredrick Day and Brett Colvine include, but are not limited to statements:**

1.  that in 1989 Levinson had agreed to act as a supervising attorney for Holstein's
    **"Bankruptcy Practice".**

2.  that Lenore Nelson  worked for Holstein's **"Bankruptcy Practice".** (See contra, p. 3
    of original Lawline v. ABA Complaint, stating that "**Ms Nelson is presently office
    manager, and head paralegal for LAWLINE**", (See First Amendwed Complaint in
    original Lawline v, ABA, 88 C 07203, **Exhibit 22,** click here),

3.  that Levinson had never given anyone permission to use the Lawline Client Fund
    Account at First National Bank/Bank One.Chase, account # 29-08913, which was
    registered with the Illinois ARDC as Holstein's/ LAWLINE'S official client fund
    account since 1990,

4.  that Levinson had never given Holstein or Nelson permission to use to use account
    29-08913,

5.  that Levinson had never given Holstein or Nelson permission to issue checks on
    account 29-08913,

6.  that Levinson had asked Lenore Nelson to close account 29-08913.

188.  That according to the offical Pacer Bankruptcy Court Database **no
bankruptcy cases** were filed by Levinson or Holstein between September19, 1989 and
October 15, 1993.

189.  That during Levinson's interview with secret service investigator, defendant
Day, Levinson  stated that "he spoke  with Lenore Nelson and asked her to close the
account under his name, **although Nelson could not legally close any exclusive
Levinson bank account unless she was an authorized signatory on that account.**

190.  That defendant Day failed to conduct a reasonable inquiry, and  did not
followed up on Levinson's statement that Levinson's had "asked Lenore Nelson to close
account 29-08913 ",  although Nelson could not legally close any  Levinson bank account
unless she was an authorized signatory on that account.

191.  That, according to Day's sworn testimony before the Grand Jury, defendant
Day did not seek any information from First National/Bank One/Chase regarding account
29-08913, either before interviewing of Levinson

192.   That, upon information and belief, Levinson knowingly made these materially false statements to Secret Agents Day:

1.  to protect his Judicial position,

2.  to avoid allegations of unethical conduct for violating Rule 5.4 while in private practice,

3.  to avoid allegations of ethically wrongful conduct for allowing a non-lawyer to be an authorized signatory on an attorney client fund account ,

4.  to avoid allegations of abusing his judicial position to influnce officers at Chase/Bank One, First National Bank, after asking Holstein to remove his sigature from account 29-08913 in February 2003 while he was interviewing to become a Circuit Court Judge, and

5.  to preserve his personal popularity his Illinois Lawyer peer group, as members of the Illinois State Bar Association (ISBA) had previously organized the members of the ABA House of Delegates to reject the Official  ABA Rules Committee recommendation to modify Rule 5.4 in the public interest.

193.   That on January 27, 2009, Levinson under oath acknowledged the authenticity of his signature, LeNore Nelson's signature, and Holstein's signature on a first generation copy of a signature card from First National Bank that added Nelson and Holstein as authorized signatories to account 29-08913, and which was signed all three persons in Holstein's presence.

194,  That subsequent to the ISBA annual convention in Wisconsin during  June 2009, Holstein telephoned Levinson at his chambers and left a message with an unknown secretary inquiring whether Levinson woud be interested in playing golf with some other

judges, or whether Levinson would like to join them for lunch when they finished their golf round.

195.   That Levinson never returned Holstein's telephone call.

### Levinson's Role, transition and Lenore Nelson

196.   On Passover, subsequent to the death of Lenore Nelson, but prior to Levinson applying for a judgeship, Levinson and Holstein had an extensive consultation regarding the future operation of LAWLINE.

197.   Levinson had written Holstein's will prior to Holstein and Nelson getting married.

198.   For LAWLINE transition purposes, and client protection in the event of Holstein's intimely death or incapacity during events relating to his thirty-year "second professional career" of ski/snowboard racing, teaching snowboard instructors, coaching, and training with professional World Cup Racers and U. S. Olympic team members, the authorized signatures on the LAWLINE accounts remained the same as they had been since 1990 during the original LAWLINE v. ABA case, and as officially registered with the Illinois ARDC

199.   Holstein had previous taught commercial paper and articles 3 & 4 of the UCC to law students on several occasions.

200.   After the death of Lenore Nelson, as telephone and online banking grew rapidly, trusted females associated with LAWLINE, were given the LAWLINE bank account passwords to execute checks by phone as "Lenore Nelson", and protect the clients in situations when Holstein could not be contacted, was out of state, or was

incapicated as a result of the chronic illliness he has suffered from since he was 19 year old undergraduate at Notre Dame..

### Defendant Fredrick Clyde Day and  Potential Future Plaintiff Lisa Vega

201.  Defendant Fredrick Clyde Day resides within the Northern District of Illinois in Lake Bluff Illinois and was admitted to the Illinois State bar in 1999.

202.  Defendant Day served as a U.S. Secret Service Agent, and as an investigator with the Office of the U.S. Attorneys Office for the Northern District of Illinois.

203.  According to documents tendered to the Plaintiff by Assistant  U. S. Attorney, Brian Netols, defendant Day was assigned as the chief investigator in the prosecution of the case against plaintiff Holstein, and defendant Netols was Day's supervising attorney regarding the matters related hereto.

204. Upon information and belief' on or about May 11, 2006, during the evening hours, defendant Day appeared unannounced at the residence of Lisa Vega.

205.  That Lisa Vega is a divorced single mother of two minor feamale children, was a part time clerk for Lenore Nelson at LAWLINE to offset her apartment rent, and approximately 14 months after Lenore Nelson's death in an automobile accident, became Holstein's "significant other" and personal assistant.

206.  That the "significant other" part of the relationship between Vega and Holstein ended in late 2004 or early 2005, because Vega did not want to have any more children, and Holstein did not want to use a "serrogate" birth mother.

207.  In 2003 or 2004, Holstein and LAWLINE had previously represented Vega when Vega was visited unannounced in the evening hours at her residence, and

interragated by Secret Service Agents, about telephone calls threatening President Bush, which had been made on Vega's stolen cel phone.

208.  Upon information and belief during defendant Day's unannounced visit to Lisa Vega's residence during the evenimg hours on or about May 11, 2006, Defendant Day:

**1.**  threatened to prosecute Vega for activities related to LAWLINE and Holstein,

2.  informed Vega that Vega, Holstein, and LAWLINE had engaged in the unautherized practice of law. These threats were similar to the oral threats made to Lenore Nelson by the Office of the U.S. Trusttee in the original LAWLINE v. ABA case, prior to the United States Trustee filing case 88 A 0733 in the bankruptcy court. ( See generally, M. Scott Michel, United States Trustee for the Northern District of Illinois v. Lawline , a non-incorporated Association, Thomas Holstein, and LeNore Nelson, 88 A 0733, and order of Dismissal, attached hereto as Group Exhibit 9, **click here**),

3.  told Vega that Holstein was going to be prosecuted for bankruptcy fraud,

4.  told  Vega that she would be prosecuted with Holstein unless she cooperated with the Office of the U.S. Attorney in Holstein's prosecution,

5.  told Vega not to talk with Holstein, and

6.  suborned the purgery of Lisa Vega, acting beyond the scope of his employment, by using these threats of prosecution to get Miss Vega to falsely state significant material facts under oath regarding several pro se bankruptcy petitions, including but not limited to:

1. that Holstein instructed Vega to "black out" disclosure information in the pro se bankruptcy petitions after they were printed from the computor,

2. that the checks from the LAWLINE Client Fund Account at First National Bank/Bank One/Chase, that were used to pay the filing fees on these cases, were "presigned by Holstein" and given by Holstein to Vega to file the cases,

3. that Vega did not draft the pro se petitions in issue, and

4. that Vega did not sign Holstein's name on the "blacked out" Bankruptcy petitions and schedules.

209.  That all of these pro se cases were manually filed by Vega after July 1, 2005, which was the effective date of the Bankruptcy Court Mandatory Electronic Filing Rule, and which prohibited LAWLINE and Holstein from registering to electronically file cases because Holstein did not work for an "entirely lawyer owned law firm" in accord with rule 5.4. (See, Judge Wedoff emails, Group Exhibit 12a, **click here**),

210.  That Miss Vega's suborned, purgerous, and material false statements as directed by defendant Day:

1. were subsequently repeated by Miss Vega in her sworn witness statements that were written in a handwriting that was not Miss Vaga's, and is believed to be the handwriting of defendant Day, and

2. were subsequently repeated by Miss Vega in her sworn testimony before the Grand Jury which, in reliance on these purgerous and material false statements, indicted

49

Holstein on _____ as part of the Bush Administration Department of Justice national

bankruptcy lawyer "sting" operation, commonly known as "Operation Truth or

Consequences", that indicted 250 bankruptcy lawyers across the United States after

the effective date of the new Bankruptcy Act.


211.. That immediately following defendant Day's departure from Lisa Vega's

residence on or about May 11, 2006, and while Miss Vega was still emotionally upset,

Miss Vega went directly to the residence of another person who had performed services

for LAWLINE, which was located in the same "Lakeview"/Chicago neighborhood.

212. That upon arrival Miss Vega had this "other person", telephone Holstein and

1. inform Holstein of defendant Day's unannounced vist,

2. inform Holstein that he was going to be prosecuted for Bankruptcy Fraud, and

3. inform Holstein that "they" were not going to go after "her" (Vega) if she testified

   against him.

213. That during this telephone call, Holstein could hear Lisa Vega's upset and

emotional voice in the background as the "other person associated with LAWLINE"

relayed questions and answers between Lisa Vega and Holstein.*** thur 7:44 am

214. That subsequent to her Grand Jury testimony and, upon information and

belief, as the direct proximate and foreseeable result of the emotional, philosphical, and

religious trauma and stress caused by knowingly lying under oath to the Grand Jury as

directed by defendant Day, and as conducted and remotely condoned by supervising

Assistant U.S.Attorney Netols, Miss Vega relocated, changed her telephone numbers, left

her part time job, gained excessive weight, and hid from her friends, Holstein, Holstein's

attorney, and certain family members for almost three years, except for a brief appearance at her grandfather's funeral.

215. That, upon information and belief, Miss Vega also concealed herself from the Office of the U.S. Attorney to escape the situation, and was out of contact with them for almost three years from November 2006 until approximately January 1, 2009.

*****

<u>**Knowingly Material False Statements of Lisa Vega as Repeated By**</u>

<u>**Defendant Day before the Grand Jury**</u>

216. That on October 10, 2006, Defendant Day, acting in conjunction with the leading questions of Assistant U.S Attorney Netols, knowingly made material false statements to the Grand Jury as follows:

(Netols} " Q.    Okay. And when you interviewed Ms. Vega did she tell you that she had typed in Mr, Holstein's name but then blacked out or scratched out his name at his instrution?

(Day)    " A.    Yes.

(Netols} " Q.    And  is that clear because at that point it was clear to her from him that his license had been suspended already?

(Day)    " A.    Either was suspended, yes, that that's what she said.  Because his license was suspended.

(Netols} " Q.    Your correct that that statement because one of these bankruptcies  he's filed shortly before his license is suspended and the other three are filed afterwards?

(Day)     " A.     That's Correct. (See transcript, Special August

2006-1 Grand Jury, October 10, 2006, 11:30 a.m., p. 8.)

217.  That Holstein was in good standing and fully authorized to practice in

Illinois, and in the District Court of the Northern District of Illinois, when all the cases

related hereto were filed "pro-se" by Holstein in an effort to modify and reverse the

Mandatory Electronic Filing Rule as permitted under Illinois Rule 1.2 (f)(2).

218.  That with out the individual knowingly material false statements above,

and/or the cumulative pattern of the knowingly material false statements above, the

Grand Jury would not have indicted Holstein.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

### Defendant Day and Material False Statements Before the Grand Jury

219.  That defendant federal investigator Day, acting as part of the boycott,

combination and conspiracy herein, and acting beyond the scope of his employment:

1.  intentionally failed to make a reasonable inquiry regarding Holstein's authorization to

    use the "Levinson" "LAWLINE  CLIENT FUND ACCOUNT" at First National

    Bank/Bank One/Chase to pay the filing fees for the "pro-se" cases, or

2.  knowingly and intentionally concealed  material exculpatory evidence from his

    employer, the fereral court, the Grand Jury, and Holstein.

    That defendant Day, acting as part of the boycott, combination and conspiracy

herein, and acting in violation of ABA Rule 3.8 (e), "Special Responsibilities of a

Prosecutor",  knowingly and intentionally did not seek to obtain this account information

from First National Bank/Bank One /Chase before interviewing Judge Levinson, who

was subject to the confidentiality obligations of attorney-client privelege regarding

Holstein, LAWLINE and Nelson under Illinois Rule 1.6.

220.  That on October 10, 2006, Defendant Day avoided directly answering

Assistant U.S. Attorneys Netols' direct question before the Grand jury as follows:

> (Netols} " Q.     -- did you look at the records of showing how the
>
> filing fees were paid for these bankruptcies?
>
> (Day)      " A.     Yes.
>
> (Netols} " Q.    Now, in the course of that did you determine that
>
> the filing fees were paid on checks written on what's called the Alfred
>
> Levinson Law Line Account?
>
> (Day)      " A.     Yes.
>
> Netols} " Q.     Now, who's Alfred Levinson?
>
> (Day)      " A.     Alfred Levinson is currently a Judge in Cook
>
> County, a sitting Judge in Cook County who was a colleague or an
>
> associate of Thomas Holstein...
>
> (Netols} " Q.    Now, **did you do -- obtain any records from**
>
> **Bank One of the Alfred Levinson Trust  Account?**
>
> **(Day)      " A.     We received some records both from the**
>
> **trustee and from Mr. Levinson who -- it was correspondence he had**
>
> **sent to the ARDC..."** (See transcript, Special August 2006-1 Grand Jury,
>
> October 10, 2006, 11:30 a.m.,  pp. 9 -10.)

221.  That Rule 1.6 provides in pertenate part that :

" a lawyer shall not, during or after termination of the professional relationship with the client, use or reveal a confidence or secret of the client known to the lawyer unless the client consents after disclosure."

222.  That defendant Levinson, to protect his judicial position from from allegations of unethical violations of Rule 5.4 regarding his twenty year association with LAWLINE:

1.  provided knowingly material false information to federal investigator Day,

2.  wrongfully cooperated with the ARDC, with the Office of the U.S. Trustee, and with the Office of the U.S Attorney in Holstein's prosecution, and

3.  failed to contact LAWLINE or Holstein before giving Day, the Office of the U.S. Trustee, and the ARDC this materially false information that was severly damaging to LAWLINE and Holstein.

223.  That, upon information and belief, Assistant U.S. Attorney Brian Netols:

1.  learned that Levinson's and Day's information was knowingly and materially false during the course of Holstein's prosecution,

2.  kept this exculpatory information a secret, and

3.  failed to inform Holstein or his attorney of this exculpatory evidence and information, acting knowingly in violation of the guide lines of In re Brady.... See article.

**Concealment of Exculpatory Evidence on File with the Illinois ARDC**

224.   On or about May 12, 2006 Defendant Day, contemporaneous with his initial unannounced visit to Vega, went to the Office of the Illinois ARDC and reviewed Holstein's files and information.

225.   Upon information and belief, Day met with defendant Coleman, who assisted him with Day's review of the documents at the ARDC during this visit .

226.   That at the time of Day's visit to the ARDC those files included  but were not limited to:

1.   the official registration of the "Levinson" "LAWLINE CLIENT FUND ACCOUNT" as Holstein's and LAWLINES's official client fund account,.

2.   Several hundred checks issued by Holstein and Nelson that were written on this account to the Clerk of the Bankruptcy Court to pay the filing fees on bankruptcy cases before Holstein removed Levinson's signature was from this account upon Levinson's request on February ___ 200___,

3.   Several dozen checks from this account to pay the "contract lawyers" that regularly did the routine bankruptcy first meeting and routine daily court call,

4.   copies of the"LAWLINE" Illinois trademark/servicemark registration filed with the Illinois Secetrarty of State,

5.   copies of the original Lawline v. ABA case,

6.   copies of adversary case _____, which was filed by the Office of the U.S. Trustee which triggered the original ABA case, and

7. copies of the pleadings in the case of Adams ___, which Holstein, and

   LAWLINE, and Professor Art Scheller researched, organized, and initiated

   against the ARDC,

8. copies of television commercials when LAWLINE WAS A "Illinois Not For

   Profit Corporation, and

9. copies of LAWLINE newspaper ads with Levinsons listed as the lawyer

   responsible for the content of the adm, and

10. Information pertaining to Holstein's 1989 suspension during the original

    ABA case, and documents related thereto, including but no limited to:

    (a) subpoened depositions of Holstein taken by a former senior counsel of the

    ARDC regarding lunches at the University Club of Chicago between Holstein

    and official members of the "Watchdog" Committee that was appointed to

    investigate improprieties within the Illinois ARDC (See generally, **Exhibit**

    **19,** click here.),

    (b) subpoened depositions of Holstein taken by a former senior counsel of the

    ARDC regarding lunches at the University Club of Chicago with Cheriff

    Bassioni, who was an official member of the "Watchdog" Committee that

    was appointed to investigate improprieties within the Illinois ARDC,  a

    prominant  Arab commuinity leader, one of Holstein's legal mentors, and the

    best man in Holstein's wedding,who was a prominent (See generally, **Exhibit**

    **19,** click here.),

    (c) documents related to a settlement agreement "if Holstein, LAWLINE,

    Nelson, and Novak  would voluuntarily arrange to have to have the original

Lawline v. ABA suit voluntarily dismissed, and

(d) a transcript of an explosive outburst by the senior counsel of the ARDC
related to Holstein's participation with "Watchdod" committee members that,
upon information and belief, resulted in this senior counsel being asked to
resign from the ARDC for unethical ex-parte communication with an Illinois
Supreme Court Justice.

227. On October 10, 2006 defendant Day testified before the Grand Jury as
follows:

> Netols} " Q.     And as part of your investigation did you get the
> ARDC file on Mr. Holstein?
>
> (Day)    " A.     I reviewed the file, yes.
>
> (Netols}  " Q.    And **did you copy things that were of
> importance to the investigation?**
>
> **(Day)      " A.     I did. ".** (See transcript, Special August 2006-1
> Grand Jury, October 10, 2006, 11:30 a.m.,  p. 3.)

228. On or about January 6, 2009 Miss Vega called Holstein in Wisconsin, left
her telephone number, and left a brief message that "it was urgent", and she "had to talk
to" him.

229. Holstein attempted to contact his attorney immediately after hearing Vega's
message, but was not able to speak with him.

230. Holstein then spoke with the "other person" from the telephone call that Vega had placed to Holstein immediately after defendant Day's initial vist to her residence on or about May 11, 2006, and was informed that Miss Vega had also called this "other person" after being our of touch for approximately three years.

231. As a result, Holstein returned Miss Vega's call at approximate 10:00 P.M. In this telephone phone call Vega and Holstein agreed that Vega would call Holstein to talk at 9:15 the following morning, and spoke about nothing else during this conversation.

232. Miss Vega did not call Holstein at 9:15 the following morning, and that afternoon Holstein's attorney received a telephone call from the Office of the U.S. Attorney instructing his attorney to tell Holstein to stop calling Vega.

233. That upon information and belief, Day's review of the documents at the ARDC during this visit was intentionally selective and intentionally excluded exculpatory evidence.

### Defendant Netols

234. That on _____ Assistant U.S. Attorney Netols, in furtherance of the combination and conspiracy herein, and without notice to Holstein or his attorney, made an oral motion in open court to quash a subpoena to the Illinois ARDC for the exculpatory evidence which had been previously concealed from Holstein and his attorney by defendants Day and Colman, and is itemized herein in paragraphs _____.

235. That this motion was granted by Judge Grady, who had been a named judicial defendant in the original Lawline v. ABA case when he was Chief Judge of the District Court.

236. That on _____ Assistant U.S. Attorney Netols, in furtherence of the combination and conspiracy herein, and without notice to Holstein or his attorney, made an oral motion in open court to quash a subpoena to First National Bank/Bank One/Chase for the exculpatory evidence itemized in the in the subpoena which is attached hereto as Exhibit 26, click here), and , that had been previously concealed by defendants Rasnak, Levinson, Day, Colman and First National Bank/Bank One/Chase.

237. That this motion was granted by Judge Grady.

238. That on or about Decdember 20, 2007 Holstein had retained an experienced and qualified handwriting expert, who had worked with the Chicago Police Department and with the Office of the Cook County States Attorney, and who had testified previous in several Federal District Court trials, to review and report on the signatures of Holstein, Vega, Levinson, and Nelson  on documents that had been provided to Holstein and his attorney by Netols.

239. That on or about March 17, 2008, Holstein paid the handwriting expert in full for his report.

240. That subsequent thereto, and on the direction of his attorney, Holstein provided Netols with copies of the documents that the handwriting expert had reviewed.

241. That on _____ Netols, in open court, and upon information and belief, without any commnication with Vega since her sworn testimony before the Grand Jury on _____, informed Judge Grady that Vega would agree to signing Holstein's name on documents and checks in a manner that totally contradicted Vega's sworn testimony to theGrand Jury.



242. That on _____ Netols, in open court Netols was ask to provide information about defendants Days initial unannounsed vist to Vega on or about _____ as described herein, which had not been provided to Holstein or his attorney.

**** 243. That on _____ Netols, in open court Netols told Grady that

_____.

244. That on January 24, 2009 Netols proposed a Plea Agreement that reduced the charges against Holstein to a Mistameaner of contempt of court without providing any information about defendant Day's unannounced visit to Vega as Netols had represented that he would.

******** 12:26 10-04-09

245. That defendant Day was not on the U.S. Attorneys witness list for trial and did not testifiy.

226. That defendant Day's lies were coordinated with defendant Coleman, who lied to a tribunal of the Illinois ARDC, beyond the scope of her ARDC employment, regarding the ethical propriety of having a non-lawyer as a signatory on the LAWLINE client trust fund account at First National Bank/BankOne/Chase.

### Defendant Coleman

227. Defendant Coleman was admitted to the Illinois bar on November 4, 1993, is a prosecutor for the Illinois ARDC who was assigned to Holstein's files, and resides in the Northern District of Illinois.

228. That defendant knowingly lied to a State of Illinois tribunal beyond the scope of her employment.

229. That between 2002 and the current date defendant Coleman also engaged in improper prosecutorial misconduct, which was, arguably, not beyond the scope of her employment and related to ARDC case _____, which Holstein settled due to lack of funds to pay his defense attorney to take the case to trial.

230. That, through the grace of God, the Plaintiff has had the good fortune and personal satisfaction to work "pro bono" on several litigation teams protecting consumers, and litigating against the Illinois Supreme Court, federal officials, and Bankruptcy Judges for their failure to protect "the public interest" and consumers. (See, In re Adams).

231 That at least two of these cases, **reversed improper uniform policies of the bankruptcy judges for the Northern District Court, and/or the uniform and wrongful policies of the Office of the United States Trustee, similar to the goal of the case herein.**

**232. That, as well stated by federal Judge Coar, when he was the U.S. Trustee, "the tail of pragmatism has wagged the dog of law" in the bankruptcy court for too long.**

233. That these cases include but are not limited to consolidated hearings on several bankruptcy cases in which defendants Rasnak, Harvarlis, Wedoff, and (non defendant) Former U.S. Trustee, David Coar, who is now a judge on the District Court , were involved. (See, consolated cases, 86 B 13555, 86B 15406,87 B7272,87 B 9960, 87 B7521,87 B 1320, defendant Judge Wedoff, regarding judicial wrongful distribution of over a $1,000,000 annually of consumer debtor's funds to creditors.), and consoladated cases (See, 80 B 15378,81 A 1952,80 B 09205, 81 A 1953.81 B 4375, 80 B 6998, 81 A

1974, 80 B 1738, 81 A 1971, defended by U.S.Trustee Coar, regarding the wrongful

distribution by the Chaper 13 Trustee, of over a $1,000,000 annually of consumer

debtor's funds to creditors because the Chapter 13 failed to object to improper proofs of

claim. ( See, also Holstein and Judge Merrick's testimony before the Congressional

Rules Committee (Exhibit __).

234. That the above cases were contemporeanous with acts of the ABA and

Illinois ARDC  regarding Rule 5.4, and provide a basis to calcuate the minimum annual

amount of damages to consumers, which were estimated to be at least a $1,000,000 per

year in the pleadings of the original Lawline v. ABA suit.t not limited to .

that

WHEREFORE, plaintiff prays that this Court adjudge, declare and decree:

1.  that the aforesaid combination and conspiracy, and acts done in pursuance

thereof, were and arean unlawful restraint of trade and commerce, and illegal

primary boycott in violation of the section 1 of the Sherman Act,

2.  the the aforesaid conspirscy to monopolize were in violation of section 2 of

the Sherman Act.

3.  That this court award attorneys fees and the costs of this suit in an amountaqs

provided in Section 4 of the Clayton Act ,

4.   that this court award plaintiff threefold damages as sustained by plaintiff  and

the costs of this suit,

5.  that this court enjoin the enactment of the new Illinois Rules of

Responsibility that are do to become effective on January 1, 2210,

6. that this court enjoin the defendants from their continuous and gogoing combination and consipiracy described herein, enactment of the new Illinois Rules of Responsibility that are do to become effective on January 1, 2210,

7. that this court, in order to rectify the damage to consumers and to the general public for impeeding their right of access to the courts, order the defendants to pay the sum of $44, 000,000 to fund a research and development center to facilate the development of innovative legal delivery systems, increase competition among lawyers, reduce the cost of legal services, and ease the access of consumers to the courts,

8. to award damages that are equitable and just.

## COUNT II

## VIOLATION OF THE CIVIL RIGHTS ACT OF 1871 AS AMENDED, 42 U.S.C. SECTION 2201-2202, DECLARATORY RELIEF AND INJUNCTION

Plaitiff realleges and incorporates herein by reference paragraphs1 - 229 of Count I as paragraphs 1 - 229 of Count II.

This court has Jurisdiction of this claim under 28 U.S.C. Sec. 1331 and 1343 (a) (3), and 1343 (a) (4) in that the claim herein arises under Section 1083 of the Civil Rights Act of 1871, as amended, 42 U.S.C. Sec. 2201-2202, and under the Declaratory Judgment Act, 28 U.S.C. Sec. 2201-2202, and under the First and Fourteenth Amendments to the United States Constitution. That Venue properly lies in this district under 28 U.S.C. 1391 the defendants reside within this district, or, maintain an office within this district and are not immune from relief under Section 1983 of the Civil Rights Act of 1871.

Certain defendants, generally immune in whole or in part from action under 42 U.S.C.Sec.1983, are properly joined as party defendants under 42 U.S.C. Sec. 1983 for exceeding the scope of their employment, failure to make a reasonable inquiry under Rule 11, lying under oath to a Federal Grand Jury, and/or lying to a State of Illinois judicial tribunal when they had actual knowledge, and/or reason to know, that their statements were false.

Plaintiff seeks declaratory relief that the mandatory electronic filing rule of the Bankruptcy Court and that Rule ____ of the Illinois Code of Professional Responsibility (Illinois Rule) and ABA Rule ____ are unconstitutional on their face and as applied in the instant case under the first and fourteenth Amendment of the United States Constitution which protect and guarantee freedom noncommercial and non-commercial speech.

Plaintiff specifically seek declaratory relief that the overly broad blanket prohibition contained in the above rules unconstitutionally restricts the freedom of Holstein, and of all Illinois licensed lawyers, from associating in the public interest with non-lawyers from inter-professional corporations, partnerships, unincorporated associations, and other business entities which include, or would include as part of their activities the dissemination of legal information,, advice. or provision of legal service by licensed lawyers, which has been traditionally characterized as activities related to the "practice of law", and which would compete in the market place with licensed lawyers who practice under the tradition law firm business structure, as required by the challenged rules.

Plaintiff seeks further declaratory relief that the challenged rule are overly broad and unconstitutional on their face because any genuine state or federal interest to

safeguard and protect consumer welfare can be satisfied in a less restrictive manner, such as the ABA/"Kutek Commission" rule that was proposed for approval to the ABA HOD, and rejected by the ABA HOD in 1983. (See, HOD transcr1pt and "Kutek Commission" proposed rule, **Exhibits 3 and 2)** .

<div align="center">

**COUNT III**

**VIOLATION OF THE CIVIL RIGHTS ACT OF 1871 AS AMENDED, 42 U.S.C.**

**SECTION 2201-2202, DECLARATORY RELIEF AND INJUNCTION**

</div>

-

Plaitiff realleges and incorporates herein by reference paragraphs 1- 229 of Count I as paragraphs 1-111 of Count II.

112. This court has Jurisdiction of this claim under 28 U.S.C. Sec. 1331 and 1343 (a) (3), and 1343 (a) (4) in that the claim herein arises under Section 1083 of the Civil Rights Act of 1871, as amended, 42 U.S.C. Sec. 2201-2202, and under the Declaratory Judgment Act, 28 U.S.C. Sec. 2201-2202, and under the First and Fourteenth Amendments to the United States Constitution. That Venue properly lies in this district under 28 U.S.C. 1391 the defendants reside within this district, or, maintain an office within this district and are not immune from relief under Section 1983 of the Civil Rights Act of 1871.

113. Certain defendants, generally immune in whole or in part from action under 42 U.S.C.Sec.1983, are properly joined as party defendants under 42 U.S.C. Sec. 1983 for exceeding the scope of their employment, failure to make a reasonable inquiry under Rule 11, lying under oath to a Federal Grand Jury, and/or lying to a State of Illinois

judicial tribunal when they had actual knowledge, and/or reason to know, that their statements were false.

114. Plaintiff seeks declaratory relief that the mandatory electronic filing rule of the Bankruptcy Court , that Rule 5.4 of the Illinois Code of Professional Responsibility, that rule 5.4 of the new Illinois Rules of Professional Responsi bility which goes into effecton Jannuary 1, 2010, and that ABA Rule 5.4 are unconstitutional on their face and as applied in the instant case under the first and fourteenth Amendment of the United States Constitution which protect and guarantee freedom noncommercial and non-commercial speech.

115. Plaintiff specifically seek declaratory relief that the overly broad blanket prohibition contained in the above rules unconstitutionally restricts the freedom of Holstein, and of all Illinois licensed lawyers, from associating in the public interest with non-lawyers from inter-professional corporations, partnerships, unincorporated associations, and other business entities which include, or would include as part of their activities the dissemination of legal information,, advice. or provision of legal service by licensed lawyers, which has been traditionally characterized as activities related to the "practice of law", and which would compete in the market place with licensed lawyers who practice under the tradition law firm business structure, as required by the challenged rules.

116. Plaintiff seeks further declaratory relief that the challenged rules are overly broad and unconstitutional on their face because any genuine state or federal interest to safeguard and protect consumer welfare can be satisfied in a less restrictive manner, such as the ABA/"Kutek Commission" rule that was proposed for approval to the ABA HOD,

and rejected by the ABA HOD in 1983. (See, HOD transcr1pt and "Kutek Commission"

proposed rule, **Exhibits 3 and 2).**

     Respectfully submitted,

Thomas Holstein
Pro-se
1953 West Belmont
Suite 2001
Chicago, Illinois
847-380-6277
262-215-6414

## Index - Appendix "A"

COUNT I:  COMBINATION AND CONSPIRACY IN RESTRAINT OF TRADE.. 3

Introduction: ………………………………………………………....3

Filing v Representation : ……………………………………………...4

Rule History: ………………………………………………………...6

Obsolete: …………………………………………………………….7

Selective Enforcement: …………………………………………...…8

PRIOR LITIGATION BETWEEN THE PARTIES: …………………………8

Preadoption hearings and debate: ……………………………………11

Elderly attorneys and part time practioners: …………………………11

Impeding the public Interest and poor persons: ……………………...12

Cost reduction in the Bankruptcy Court Clerk's Office v. Impeding Access to the

Bankruptcy Court: ……………………………………………………12

Flaw in the Original LAWLINE  Case ………………………………13

Illinois Rule 1.2 and creation of case and controversy by filing pro se cases:...14

The Pro-se Cases …………………………………………………… 15

Paying filing fees and Chase Bank………………………………….18


Judges and lawyers associated with LAWLINE …………………… 22

Plaintiff: ……………………………………………………… 23

The LAWLINE ……………………………………………………25

Illinois Rule 2-107……………………………………………...…… 26

Defendants: ………………………………………………………29

ABA: ............................................................................................29

First National Bank/Bank One/Chase ..............................................32

The judicial defendants ................................................................34

Defendant Sandra Rasnak ............................................................36

Defendant Alfred Levinson............................................................ 41

Levinson's Role, transition and Lenore Nelson...................................45

Defendant Fredrick Clyde Day and Potential Future Plaintiff Lisa Vega ......46

Knowingly Material False Statements of Lisa Vega as Repeated By Defendant Day

before the Grand Jury....................................................................51

Defendant Day and Material False Statements Before the Grand Jury...........52

Concealment of Exculpatory Evidence on File with the Illinois ARDC.........54

Defendant Netols..........................................................................58

Defendant Coleman .......................................................................60

COUNT II:   VIOLATION OF THE CIVIL RIGHTS ACT OF 1871 AS AMENDED 42

U.S.C.   SECTION 2201-2202, DECLARATORY RELIEF AND INJUNCTION: ...61

COUNT III:   VIOLATION OF THE CIVIL RIGHTS ACT OF 1871 AS AMENDED,

42 U.S.C.   SECTION 2201-2202, DECLARATORY RELIEF AND INJUNCTION...62